No. 56.—WM. MOODY and wife, plaintiffs in error, *vs.* LEWIS DAVIS, defendant in error.

[1.] The complainant moved for a continuance, showing that a commission had been forwarded to the State of Alabama, where it was understood the witness resided, and was returned unexecuted, because he had removed from that State; that on that account, at the next term of the Court the cause had been continued; that complainant had learned the Parish in the State of Louisiana, to which the witness had removed, but did not know at what place in that Parish he lived; that he had continued to make inquiry as to his residence, but had not since the last term taken out and forwarded a commission. *Held,* that the shewing was not sufficient.

[2.] A witness speaking of a contract between two persons which he heard, said "the *understanding* was that Davis should pay himself out of the said amount, for his trouble and expense—the balance to go to his daughter Frances." *Held,* that the evidence was admissible.

[3.] It is the right and duty of counsel to bring to the notice of the Court, all such questions of law, as he may think necessary to be determined, in order to secure the rights of his client; and it is the right and duty of the Court to determine every principle of law, which he may think applicable to the case, whether suggested by counsel or discovered by his own knowledge and observation.

In Equity, in Crawford Superior Court. Tried before Judge STARK, February Term, 1851.

The bill charges that previous to the intermarriage of the complainants in 1848, unfortunate difficulties, disagreements and disputes, had arisen between Lewis Davis, the defendant, (and the father of Mrs. Moody, one of the complainants,) one Baldwin M. Fluker, and Mrs. Moody, then Miss Davis, concerning grievous injuries and wrongs inflicted by the said Baldwin M. upon Mrs. Moody, the complainant; that for the purpose of effecting a compromise and adjusting the difficulties, and making compensation for the wrong and injury done the complainant, Mrs. Moody, the said Baldwin M. in 1843, turned over to Davis, the defendant, a negro man, named Squire, of the value of $600 00, together with good notes amounting in the aggregate to $400 00, to have and to hold the same for the use and benefit of Mrs. Moody, one of the complainants, and the said Davis then and there promised and agreed faithfully to execute said trust. The bill further alleges, that previous to the intermarriage of complainants, the defendant, as an inducement thereto, led complainant, Moody, and others in the community, to believe, and gave them to understand, that the said property belonged to his daughter, now Mrs. Moody. The bill prayed that the defendant be decreed to come to an account with complainants, and pay over to them the value of said property.

The defendant in his answer, admitted the wrongs inflicted upon his daughter, Mrs. Moody, by Fluker, but denied that the property was turned over to him in trust for her, but on the contrary, that Fluker had paid it to defendant in satisfaction of his claims upon Fluker for debauching his daughter—who at the time was under 21 years of age.

The cause came on to be tried on the appeal, at February Term, 1851, when counsel for complainants moved to continue the case on the showing of complainants' counsel, to the effect "that Baldwin M. Fluker was a material witness, and would prove that the property was turned over by him to defendant, for the use and benefit of Mrs. Moody; that interrogatories had been sued out more than a year ago and sent to Franklin, State of Alabama, which was then believed to be the residence of wit-

ness ; that upon their receipt, Jones and Caruthers, the persons to whom they were sent, notified complainants' counsel of Fluker's previous removal, just before the August Term of the Court, 1850, and too late for counsel to forward the interrogatories and have them executed for that Term of the Court ; that they believed Fluker was still in life, but had been able only to learn the Parish in the State of Louisiana, in which he lived, and that they hoped and expected to procure his testimony by the next term of the Court." The motion to continue was overruled by the Court, and counsel for complainants excepted.

Counsel for complainants offered in evidence the testimony of William M. Brown, taken by depositions.

To the answer of Brown to the second interrogatory, which read as follows :—" I was present at a settlement between Baldwin M. Fluker and defendant ; I was present when the negro and notes, amounting in value to $1000 00, were turned over; the contract was made at Hootensville, Upson County ; I was previously called on by both parties, Davis and Fluker, to meet them there for the purpose of compromising a difficulty that existed between them ; the contract, I understood, was to satisfy Davis for Fluker's treatment to his daughter Frances ; the *understanding* was that Davis should pay himself out of the said amount for his trouble and expense, the balance to go to his daughter Frances"—counsel for defendant objected, upon the ground that Brown was a referee, and that he proved that the property was given to a stranger. The Court overruled the objection, but suggested an exception to said answer, viz: that Brown stated that " the understanding was, &c." it being the opinion of the Court, that if this was " the understanding" of the witness, it was inadmissible ; and if it was the thoughts or opinions of others, it was equally inadmissible, and so the Court rejected the evidence ; whereupon counsel for complainants again moved the Court to continue the case. The Court overruled the motion and dismissed the bill, and counsel for complainants excepted, and upon these exceptions have assigned error.

S. & R. P. HALL, for plaintiffs in error.

G. R. HUNTER, for defendant in error.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] The showing for a continuance was not sufficient; it was a question of diligence, and the rule of Court for the execution and return of commissions had nothing to do with it; the plaintiff in error had not used proper diligence to get the testimony of the witness, *Fluker.* One year preceding the term at which this continuance was applied for, a commission to examine the witness had been taken out and forwarded to *Franklin, Alabama,* and solicitors for the complainants were informed that he had removed from *Alabama.* This information was received too late to procure his testimony for the term then next following, to wit, at the August Term, 1850, and on that account the cause was continued, at the instance of the complainants, at that Term. The solicitors for the complainants further showed, that they believed *Fluker* was still in life, but that they had only been able to learn the Parish in the State of *Louisiana,* in which he lived, and that they hoped and expected to procure his testimony by the next term of the Court. This continuance was asked at the February Term, 1851. It appears then, that the cause had been once continued on the appeal for the want of *Fluker's* testimony, by the complainants, and that six months had intervened between that continuance and the present application; and that within that time no effort had been made to get his testimony, except that counsel had continued to make inquiry as to his residence. It was admitted that they had learned the State and Parish in which he resided; they should have sued out a commission and forwarded it to that State and Parish at least. That they did not do. The cause had been delayed for six months already, and if continued again, would have been delayed for twelve months, on account of this testimony. It was a case for more than ordinary diligence. We cannot say that the parties within the preceding six months, had used even ordinary

diligence.    This is not a case in which we feel authorized to interfere with the discretion of the presiding Judge in refusing a continuance.

[2.] The Court erred, we think, in ruling out the testimony of the witness *Brown.*    The bill was filed by *Moody* and his wife, to recover certain property which it charges was delivered to the defendant, *Davis,* in trust for his daughter, *Mrs. Moody,* by *Fluker,* in consideration of outrages perpetrated by him upon *Mrs. Moody.*    The witness, *Brown,* was called by the complainants to prove that the property was delivered to *Davis* for the use of his daughter ; he swears, upon examination by commission, that he was present at a settlement between *Baldwin M. Fluker* and the defendant; was present when the negro and notes, amounting in value to $1000, were turned over to *Davis.* The contract was made at *Hootensville, Upson County;* was previously called on, by both parties, to meet them there for the purpose of compromising a difficulty that existed between them ; the contract, (says the witness) I understood, was to satisfy *Davis* for *Fluker's* treatment to his daughter *Frances.    The understanding was that Davis should pay himself out of the said amount for his trouble and expense, the balance to go to his daughter Frances.* The part of the testimony last stated and underscored, the presiding Judge ruled out, upon the ground that the witness testified that the *understanding was, &c.*    The reasons given by the Judge for this ruling are, that if *the understanding* spoken of was the *understanding of the witness,* it was inadmissible, and if it was the thoughts or opinions of others, it was equally inadmissible.

If the witness intended to express his own understanding—as if he had said, *my understanding was, &c.*—I am myself satisfied that the testimony was admissible.    He had been called upon to witness the settlement between these parties ; he saw and heard what transpired, and testified to the fact that the negro and notes were turned over by *Fluker* to *Davis ;* he stated that he understood that the contract was to satisfy *Davis* for *Fluker's* treatment of his daughter *Frances ;* if then he had added *my* understanding was, &c. I should hold that he would be understood as

stating his comprehension of what the contract was, which he had already proven.   Comprehension is one of the synonimes of understanding; and one of the meanings of the word understanding, by common usage is, the way in which we comprehend a contract or a proposition.   With such a meaning to the word, where is the difference between saying *the contract was, &c.* and saying *my understanding of the contract was, &c.?*   None whatever.   The former would be clearly admissible—so also I think the latter.

Be this as it may, we do not believe that the witness referred to *his* understanding of the contract; nor do we believe that he referred to the thoughts or opinions of others; we think it very plain that he referred to the *agreement* between these parties, about which he had previously testified, and intended to say what that agreement was, just as if he had said the *agreement* was, &c.   That is, the witness intended to state what were the terms and conditions of this settlement, as the parties themselves understood or had agreed upon them.   He was clearly testifying to what the contract was.   When we say, speaking in reference to a settlement or contract made by others, the *understanding was*, we are held by the force of common usage, as well as by the standard signification of words, to say *the agreement was;* and although this word *understanding* has various meanings, according to the way in which it is used, and the connection in which it stands, yet I apprehend neither common nor polite usage, can, in the connection in which it is here found, give to it a meaning different from that we have given.   The definite article *the*, which precedes it, precludes the idea that it refers to the witness' own understanding, or to the thoughts and opinions of others, and directs it, point blank, to the contract or agreement between these parties.   Upon this assignment, this case must go back.

[3.] The objection to the admissibility of the evidence of the witness, *Brown*, upon which it was excluded, was not made by counsel, but was a suggestion of the Judge.   This *voluntary* suggestion of the presiding Judge is excepted to, and made a distinct ground of error in the assignment; in support of

Moody and Wife *vs.* Davis.

which, counsel assumed the position, that it is not the duty of the Judge of the Superior Court to exclude evidence, upon any ground of objection not brought to his view by the counsel engaged in the cause. To state the position differently, it is his duty to determine those questions of law only, to which he is moved by counsel. This discussion originated upon a judgment of the Court on the admissibility of evidence, pronounced upon a legal objection taken by himself; if however, the position taken by counsel be a sound one, it is good against all like judgments which the Court may pronounce in the progress of a cause, from its beginning to its conclusion. It denies to him the right to determine any question of law on the pleadings, on the admission of evidence, or arising out of the facts before the Jury, or arising in any other way, except such questions as are brought to his notice by the parties or their counsel. The principle upon which this denial is founded, would even limit the right and obligation of the Court to instruct the Jury, to such questions of law as may have sprung up at the instance of counsel in the progress of the cause, or upon which he may be requested to charge. If the Judge cannot, upon his own motion, decide a point of law in regard to the admissibility of evidence, I cannot see that he can do so in regard to anything else. If his obligation to determine, is dependent upon the suggestion of counsel, the rule of duty governs his instructions also to the Jury, the counsel having as much right to move instructions as to move a question on the pleadings or evidence. The question is an important one, and we are perfectly sure, free from doubt. If the plaintiff in error be right, then have we wholly mistaken the high functions of a Judge.

The duties of counsel and Judge are essentially different. Those of counsel are divisible into two classes: those which grow out of their relation to their clients, and those which appertain to them, as officers of the Court. The former originate in contract, and the relation of attorney and client constitutes no inconsiderable title of the law. The right of being represented in Court by men learned in the law and skilled in eloquence, with reference to the litigant or the accused, as an individual,

and with reference to the effect which such representation exerts upon the general administration of justice, may with truth be stated to be, a right "inestimable to freemen." Appearance by counsel is one of the ramparts of civil liberty.

It is not necessary to speak of the rights and obligations of counsel, so far as concerns their relation to their clients; except to say, that it is unquestionably the right and duty of counsel to bring to the view of the Court, for its determination, any point of law, which properly springs out of the cause, and which they may think important for the interest of their clients. They are in Court for that purpose; they are bound to observe closely, to labor diligently and to know thoroughly, in order that they may secure the determination of the rights of their client, according to law. The beautiful theory of a trial is this: Both sides are represented by counsel, that their rights may be settled, not by art or chicane, or the tricks of the orator, but *according to the law.* It is therefore, the duty of counsel to present to the Court the points which he conceives are in favor of his client; and it is his right to be heard in argument to sustain them; and when presented, it is the duty of the Court to pass upon them, if they grow out of the case, but not otherwise; and of that he is to judge. If he declines to pass upon a principle thus moved, and it springs out of the case, such declining is error, and if an appellate tribunal finds it in favor of the party moving it, a new trial will be awarded. As officers of the Court, the duties of counsel are not in conflict with those which devolve upon him as the representative of a party. They are *the friends of the Court,* enlisted with him in the sublime work of discovering truth, and dealing out justice between man and man. It is not the duty of counsel to suggest points of law which are against his client; but it is his duty to insist upon no point which he knows to be contrary to law. Whilst judgment belongs alone to the Judge—enlightenment is the province of the lawyer, and I apprehend that no Judge can be found so presumptuously vain, or so flagrantly unjust, as not to recognise, and that too with grateful emotions, the aid which he derives, in the discharge of duties more solemn than belong to any other functionary, from an able bar.

Moody and Wife *vs.* Davis.

Having thus conceded to counsel all that was claimed in the argument, I turn to the duties of the Court. Without enlarging upon a theme not only fruitful, but inviting, I remark that the ancient commission of the English Judges contains both the rule of judicial duty and the limitation of judicial discretion, in the following words, " *Facturi quod ad justitiam pertinet secundum legem et consuetudinem Angliæ.*" With a slight modification, they describe the duty and limit the discretion of a Judge in Georgia. In England, the King is called the " reservoir" of justice, and from him it is said to flow, being distributed by that body of magistracy recognised under her constitution and laws. They are his representatives for that purpose. The mandate goes forth to the able men who minister at the altar of English justice, " you shall cause to be done that which appertains to justice, according to the law and custom of England." That is, you shall dispense justice by the law and custom of England— the Statute, and customary and constitutional law of England. The mandate restrains the Judge from going beyond or outside of the law, and enjoins him to enforce the law. He shall in his discretion make no new laws, and he shall, without discretion, give effect to the laws that are of force; and this we understand to be the duty of a Judge in Georgia. The people are the depository of judicial power with us. Judges are their authenticated representatives, charged with the duty of dispensing justice, according to the constitution and laws of the State, and according to the constitution of the United States. Here the obligation and the limitation of power are analagous to what they are in England. It is the duty of the Judge to enforce the laws of the State, made in accordance with the State and Federal Constitutions—*the whole law,* as it applies, in his judgment, to the cases which come before him. He has no right and no power to withhold the application of one single principle of law, to a single case over which he has jurisdiction ; he has no dispensation, justifying or excusing an omission to *apply the law.* Neither conscientious scruples about the morality of the law, nor convictions of its inexpediency—nor what are called the tendencies of the age—nor political biases or party associations—nor fear,

nor favor, nor reward, nor the hope of reward, nor all of these combined, should be sufficiently potent to induce him, in his judgments, to *transcend* the law, or to *fall short* of its strict enforcement. If such are his duties, it is wholly immaterial whether a principle of law be brought to his notice by counsel, or is suggested by his own knowledge and observation. If the principle grow out of the case, and he believes it to be law, he is bound by the responsibilities of his position—by his official oath—by the very nature of his office—by all the expediencies of judicature, to give it full effect. To *that* he is called—for *that* he is clothed with the people's (if I may so speak) judicial sovereignty; and if conscience or aught else suggests a higher law, and conscience cannot yield, let him retire and give place to those who are willing to execute the laws. It is the business of the Judge to *know* the law; that he does *know* the law, is the presumption of all the departments of the State. He is selected, (such at least is the theory,) on account of his knowledge of the laws, as well as on account of other qualifications. He is presumed to bring to the Bench fitness for its duties. This presumption of knowledge does not attribute to him perfection in the knowledge of a science, to the mastery of which the allotted term of human life, occupied with all possible diligence, is insufficient. It does not charge him with the indispensable necessity of ascertaining and ruling every point of law which may spring out of the case, from its beginning to its conclusion. Hence, a mere omission to suggest and apply a point not brought to his notice, is not error, unless, as I suppose, it were made to appear to a corrective tribunal that he was cognizant of it. He is not presumed, of course, to be infallible; and hence, he is not liable to an action for any judgment which he may, in good faith, render in a cause over which he has jurisdiction. He is presumed to be fallible; else why provide, not only that he shall correct his own errors by a power to grant new trials, but, also, that they shall be corrected by others, by organizing Courts of Review. The presumption demands diligence to know, and diligence to apply the law—patience and pains-taking to master the facts of the case, and to ascertain upon what principles the right between

Moody and Wife *vs.* Davis.

the parties depends. With all the aid that counsel can give him, and without aid from counsel, he is bound to labor to ascertain truth—the truth of the law. Such was Cicero's idea of judicial obligation. "It is the duty (says the greatest of all the heathen philosophers) of a Judge to endeavor after nothing but the real truth." *Cicero de Officiis lib.* 2, §14. At this day the object of judicial labor is the *real truth.*

If the power over the law is limited to the points made by counsel, then the administration of the law depends upon counsel. The responsibility of the Bench would be greatly weakened, and the entire theory of judicial obligation falsified. Imperfect, indeed, would be the dispensation of justice, if the Judge should be inhibited from deciding upon questions vital to parties, because from ignorance, inadvertence, misconception, or from any other cause, counsel had failed to present them. Rarely is it found necessary for the Judge to volunteer suggestions—the vigilance and learning of counsel being quite sufficient to bring the whole case before him. The very ablest counsel, however, might overlook the most important point in his case. Whilst these things are so, it is certainly both pleasant and expedient for the Court not to be solicitous to anticipate the counsel. "It is no grace to a Judge, (says Lord *Bacon,*) first to find that which he might have heard in due time from the bar, or to show quickness of conceit in cutting off evidence or counsel too short, or to prevent information by questions, though pertinent." With us there is no jarring between the rights and obligations of the Court and the bar, and these reflections are made necessary only by the fact, that a point of error is taken in this record which involves them.

Let the judgment be reversed.