1. A ground of a motion for new trial complaining of the admission of evidence or of documents going out with the jury presents nothing for decision by the Supreme Court where no objection is shown to have been made at the trial.
2. The excerpts from the charge of the court are not, for reasons stated in the opinion, subject to the criticisms made by the movant.
3. The evidence authorized the verdict.
 No. 15390. FEBRUARY 19, 1946. REHEARING DENIED MARCH 5, 1946.
L. H. Morris was indicted in Bibb Superior Court for murdering his wife, Mrs. Millie Morris, by administering to her poisons alleged to be strychnine sulphate and other deadly poisons. The defendant filed in that court a petition for a change of venue, alleging that, because of the publicity given by the newspapers, a state of prejudice existed which made it impossible for him to obtain a fair trial and which threatened mob violence. The solicitor-general consented to an order of the trial judge directing that the case be tried in Houston Superior Court. The case was tried in that court in May, 1945. The jury returned a verdict of guilty without a recommendation, and the defendant was sentenced to death by electrocution as provided by law. His motion for new trial was denied on October 16, 1945. The exception here is to the judgment overruling the motion for new trial.
The State's evidence showed that the defendant and the deceased had been married about twelve years. They lived on White Street in Macon, Bibb County, Georgia, at the time of the wife's death on the night of February 16, 1945. They had two children, both boys, ages ten and twelve. The deceased had never complained to the members of her family about her health or shown evidence of despair, although they had been in contact with her almost weekly. The defendant was a bus driver in the City of Macon, and the deceased was employed by the Macon Shirt Company. The defendant, while driving a bus for the M. M. Bus Company on the Camp Wheeler road about two years prior to his wife's death, picked up Mrs. Ethis Pryor, who was at that time living on Cherry Street in Macon. The defendant and Mrs. Pryor became intimate and had illicit sexual relations frequently thereafter. He saw her twice a day in her apartment. He requested her to *Page 472 
obtain an apartment nearby his home, which she did, and there became acquainted with Mrs. Morris and the boys, and visited them. Mrs. Morris became aware of the relationship between her husband and Mrs. Pryor and protested to both of them. Thereupon Mrs. Pryor moved a considerable distance away, where she lived at the time of Mrs. Morris' death. The defendant continued to visit her at her new residence until about eight days before the wife's death, during which time he assured Mrs. Pryor that he had obtained a divorce from his wife, and at one time exhibited to her some papers which purported to be his divorce decree. Mrs. Pryor, however, found out that the defendant had not separated from his wife and was not divorced, and told him that she wanted nothing else to do with him and returned to him certain small gifts which he had made to her. On the next day he wrote her a letter in which he stated that he regretted what had occurred and said: "Before long I can come to you and make you the happiest time of your life. It will not be long either." Then he requested her to meet him and added: "So please let's see each other and I will promise you that it won't be long before we will be happy together. These things I am sending back. I want you to take them this time and forever." The letter further stated that the writer loved Mrs. Pryor and knew that she loved him. It also appears that he sent her two valentines, which Mrs. Pryor testified she received on February 14, 1945, and on the same date she received a postal card from Mrs. Morris, which card advised her that there had been no divorce, that the writer of the card had not applied for any divorce, that the matter was being turned over to the law, and that the writer wanted the law to put a stop to the relations between Mrs. Pryor and her husband.
The evidence further showed that the defendant telephoned the residence of Mrs. Pryor to inquire if she had received the valentines and what she thought of them. He talked to Mrs. Daniells with whom Mrs. Pryor lived. Mrs. Pryor read to the defendant over the telephone the card which she had received from Mrs. Morris, and in that conversation told him that she was going to take it to Mrs. McCord, a policewoman for the City of Macon. He requested her not to do that, and stated that he would have everything straightened out in a short time. Mrs. Pryor did, however, take the letters she had received from the defendant, the valentines, and *Page 473 
the card from Mrs. Morris to the police station and delivered them to a girl in the office of Mrs. McCord. She testified that she did this because she had been threatened several times by the defendant with death if she broke off relations with him, and that she was afraid of him. The policemen, after receiving these documents, went to the residence of the defendant for the purpose of talking to him and his wife, but neither was at home, and they failed to see either before the death of Mrs. Morris. At the time of the death of Mrs. Morris, the Morris family was living in a house at 342 White Street in the City of Macon, Bibb County, Georgia, and the house was jointly occupied by Mr. and Mrs. Smith. Mrs. Morris, on the afternoon before her death that night, came home from work between 5 and 6 o'clock. She first talked to a neighbor, L. W. Lewis, and arranged to go with him on the following Sunday to see a house which he had built and which she had arranged with him to rent. Mrs. Smith, who lived in the same house with her, went over to her apartment and talked with her until about 10 o'clock, just before the defendant arrived. She found Mrs. Morris fully dressed, and both of the children were there. Mrs. Smith went out of the apartment for a short time and returned about 8 o'clock and remained until near 10 o'clock. The son, Bobby, had telephoned his father earlier in the evening that his mother was not feeling well and requested him to get off and come home early. Mr. Pierce, who was a dispatcher for the Georgia Power Company by whom the defendant was employed, released the defendant at his own request at about 8:30, and he testified that the defendant should have been home by 9 o'clock. He reached home, however, shortly after 10 o'clock. Mrs. Morris told Mrs. Smith how long she had lived with her first husband and how long she had lived with the defendant, and stated that that was the last day she would live with him. The defendant called Mrs. Smith in about 30 minutes after he arrived home, which was about 10:30, and Mrs. Smith went into the Morris apartment and found Mrs. Morris lying on the bed, fully dressed with the exception of her shoes. Mrs. Smith testified that Mrs. Morris looked like she was trying to get up. She had never seen one with a convulsion, but she thought Mrs. Morris was having convulsions. She was jerky and drawing and could not keep straight. Her arms were drawing and her back was jerky and so *Page 474 
were her legs, and she looked like she was trying to chew something. She told Mrs. Smith she was dying, requesting Mrs. Smith to please rub her hands and arms. She stayed in that condition about five minutes. She screamed twice and died. When Mrs. Smith went in, the defendant went out on the front porch and requested her to stay with his wife until he could get help. When Mrs. Morris screamed, Mrs. Smith called the defendant and he came back to the door and looked in and went away again. He came back on the porch and talked with Mrs. Smith a while after his wife died.
The evidence shows that Mrs. Morris had a nervous affliction and had been treated by a doctor, who had prescribed a medicine which she had but which was not poisonous.
Dr. Poland, a druggist, testified that about February 9 the defendant bought some strychnine sulphate from him. The defendant told him he wanted it to kill rats, that he was bothered with wharf rats and his neighbors were bothered with them, and he wanted the strychnine to kill them. The strychnine was in the form of 1/40-grain tablets which could be pulverized. They were put in a box, and no prescription number was put on the box, but it was marked "strychnine," and marked with a poison label.
Mrs. Smith testified that, while there had been possibly one or two large rats on the premises during the time they had lived there, the rats had not given anybody any trouble.
Several days before the death of Mrs. Morris, the defendant showed a Mr. Frazier, who was also an employee of the Georgia Power Company, a box of strychnine and talked to him about whether strychnine would produce death.
After the death of Mrs. Morris, the defendant sent her body to Hart's Mortuary and ordered that it be immediately embalmed. The process of embalming required the evacuation of the stomach, that is, the content of the stomach is pumped out. The entire circulatory system was emptied in the process of embalming, and another fluid was put in the circulatory system in the place of the blood. The evidence showed that the vital organs were removed from the body of Mrs. Morris, and that a chemist, a member of the faculty of Mercer University, made a chemical examination of the stomach and found one-half grain of morphine in the walls of the stomach. He also examined a glass which the *Page 475 
defendant's confession stated was used to administer the poison to his wife, and found strychnine in the glass. He testified that, in view of the large quantity of strychnine found in the walls of the stomach, it was obvious that an examination of the content of the stomach would have revealed a large quantity of strychnine. A doctor testified that the vital organs removed from the body of Mrs. Morris showed no organic trouble or any condition which of itself would produce death.
After the death of his wife, the defendant did not notify her father, who was a night watchman at Graymont and available to a phone. The defendant did, however, notify other relatives in Savannah, and they notified the wife's father and mother. The father testified that when he came to Macon and endeavored to talk to the defendant about his wife's death the defendant refused to talk with him about the matter.
Both Mrs. Pryor and Mrs. Daniells testified that on the night Mrs. Morris died the defendant telephoned their residence at about 1:30 and said his wife was dead. Mrs. Daniells answered the phone and he told her to call Mrs. Pryor to the phone. Mrs. Pryor testified that he told her that Millie was dead, and she told him that she did not believe it. He said that he thought she would be interested to know that Millie was dead, and when she told him she did not believe it, he told her to call Hart's funeral home and see. He then said he thought he would ask her to keep Bennie for him. She asked him where he was, and he said he was down town trying to call her people. She asked him where the children were, and he said they were at home. He said he wanted her to have the children and then said, "Me and the boys are yours now if you want us."
A written confession signed by the accused and witnessed by Julian Peacock and W. L. Robertson, dated, February 23, 1945, was put in evidence. In this confession the defendant stated that he was guilty and a woman was the cause of it all. He was thirty-eight years old and his wife was thirty-four. He had had for a period of about two years an illicit relation with Ethis Pryor and he related much of their relationship in detail. His son told him that his wife said she would kill him and the woman. At one time his wife gave him some sausage to eat and he became very ill. He went to Lyons, Georgia, with Ethis and spent the night at her *Page 476 
mother's home and slept in the room with Ethis and her sixteen-year-old daughter. His wife had threatened to leave and take the boys. On the night of her death he was relieved at 8:23. He got a hamburger and a drink. He stopped at a whisky store and bought a half pint of whisky and took a drink. When he got to the house, his wife was sitting in a chair with her head in her hands. He asked her if he could do anything for her, and she said "No." She got up and went into the kitchen and came back and lay down on the bed. He had bought some strychnine for her before. She had taken some before in 1/3-grain. He had bought some the previous week. She called him to her bed and he sat down on the side of the bed. She just lay there with her eyes shut. She said she was going to take some medicine, and he told her he was going to take a drink. She got up and went in the kitchen. He asked her if she wanted a drink, and she said "No." He went in the kitchen where she was, and she said she believed she would take one, too, a "sweet toddy." He went out of the kitchen to get some water. When he got back, she had put sugar in the glass. She turned to use the slop jar and sat on the jar with her head in her hands. He had the whisky in his pocket, and he also had the strychnine in his pocket. Her head was in her hands, and he put the strychnine in her glass with the whisky and water and stirred it up. He fixed his drink. His back was to her when he fixed it. They were both standing up when she drank, and she went back and lay down on the bed. He went back in the room and sat in a chair. He noticed that she was jerky. He ran for Mrs. Smith. He put a wet towel on her head and went out to get his sister-in-law who lived a few doors down the street. He phoned for an ambulance but could not get it. He called a doctor. While he was using the phone, Mrs. Smith told him his wife was dead. He thought that after his boy told him that his wife said she was going to kill him, and after becoming sick when he ate the sausage, she was going to kill him; and when she said she would take a drink with him, he thought that if either one of them had to go, it would be better for her to go than it would for him because her health was bad and she would have a bad time of it, and he could do better for the children. He paid 25 cents for the strychnine. When he poured it in her glass he stirred it with a spoon and went to the back door and threw the bottle as far as he could. *Page 477 
Deputy sheriff Julian Peacock testified that he found two glasses on the table in the kitchen. They were not side by side. The glasses were properly marked and introduced in evidence. The witnesses to the signed statement of the accused both testified that he made the statement to them freely and voluntarily and without hope or fear induced by them, and that they took it down in longhand, and the next day had the court reporter type it and returned it to the defendant, and he read it and certain alterations or corrections were made in the written statement as he directed. This signed statement, together with the petition for a change of venue, was offered by the State and admitted in evidence.
The defendant made a long statement to the jury in which he denied his guilt and stated: "It was caused by — my wife's death was caused from a woman. She just got impressed that I was running around with this woman, staying at places with her." He stated that his wife had talked with the woman, had written to her or told him she had. The woman called him up at different times, and he recounted the physical injuries and weaknesses with which his wife had been afflicted, and that this, together with the woman, caused his wife to be unhappy and quarrelsome. He was good to his family and did everything he could for his wife. He went all to pieces when he was locked up in jail. He had never been in jail before. He had never been in court. He had never been on the witness stand, and did not know what court was. Ben Ong came up to the jail and was gouging him, talked to him two or three hours trying to get him to talk, and Ong said he knew that the defendant was guilty, and told him to get it off his chest, that he would feel better, that he could then go back there and lie on the bed and sleep and rest. He went out and bought the defendant some food. He pictured out to the defendant different cases and told of one up north and pictured the electric chair and said that, if the defendant would tell him, he could go down to the solicitor and talk and get a lawyer there to get some agreement, and said that, if the defendant did not go and say that he did it, he was going to get his son Bobby and lock him up. He stated that deputy Julian Peacock talked to him some, but talked in some ways "nice;" that Peacock said he had heard that the defendant's folks and lawyer could not come to see him, and Peacock stated that they could not keep a lawyer from coming *Page 478 
to see the defendant. The defendant said that the confession was just made under a strain, and he could not tell what it had in it without reading it. He was just gouged and in a strain until he did not know where he was and did not eat and did not sleep. He stated that nobody saw him poison his wife, kill his wife, and nobody said that he did or had seen that he did, and that he had not, and that he was just as innocent as any of the jurors.
1. The first four special grounds complain because certain evidence offered by the State was allowed, and a written confession and a petition for change of venue were sent out with the jury, but show that no objection thereto was made by the defendant, thus presenting for decision the question whether or not such complaints, not made at the trial but presented for the first time in the amended motion for new trial, will be reviewed by this court. It is insisted by counsel that, since it is the duty of the trial judge to see that the trial is conducted in a fair and legal manner, it was, therefore, his duty, on his own motion and without objection from the defendant, to exclude the evidence complained of. It is insisted that this contention is sustained by Grady v. State, 11 Ga. 253 (3), Hill v.State, 41 Ga. 484, Goodrum v. State, 60 Ga. 509,Augusta Summerville Railroad Co. v. Randall, 85 Ga. 297
(6) (11 S.E. 706), Kelly v. Strouse, 116 Ga. 872 (8-a) (43 S.E. 280), and 1 Wharton's Criminal Law (11th ed.) 269, 270, §§ 226, 227. Perhaps the most frequently referred to discussion of this question is found in Moody v. Davis, 10 Ga. 403, by Nisbet, J. There the exception under review was not to the failure of the trial judge to act on his own motion, but rather to the voluntary action of the judge in excluding evidence to which counsel had made no objection. The decision sustained the action of the court and discussed at length the right and duty of the trial judge to act thus on his own motion; and, after stating that the trial judge is presumed to know the law, but that this presumption of knowledge does not attribute to him perfection, it does charge him with the indispensable necessity of ascertaining and ruling *Page 479 
on every point of law arising out of the case, it is then said: "Hence, a mere omission to suggest and apply a point not brought to his notice is not error, unless, as I suppose, it were made to appear to a corrective tribunal that he was cognizant of it." The exception ruled upon in Grady v. State, supra, was to an interruption by the court on its own motion to direct counsel to read the whole testimony and he would find that his interpretation was wrong, and counsel admitted that upon reading the whole testimony the court was right. Thus the exception was to a voluntary act of the court without request or objection. The exception in Hill v. State, supra, was to a voluntary action of the trial judge in directing witnesses to hear their evidence read over to them. No objection was made at the time, and the action of the judge was affirmed. Another exception to the voluntary action of the trial judge was under review in Goodrum
v. State, supra, and the trial judge was there affirmed. InWoolfolk v. State, 81 Ga. 551 (4) (8 S.E. 724), cited by counsel, the opinion, after a reversal of the trial judge on other grounds, said: "We grant a new trial in this case with less reluctance because of the facts alleged in the 19th and 20th grounds of the motion for a new trial." The matters complained of in grounds 19 and 20 were outcries in the back of the audience of "Hang him! Hang him!" and another declaration by a prominent citizen near the jury of "Hang him!" While such grounds were matters for the court to act upon on its own motion, and, hence, differ from the questions here presented, which were as to the admissibility of evidence, and allowing documentary evidence to go out with the jury, and the case is thus distinguished, it should be observed that even there the reversal was not based upon those grounds alone. The exception under review in Augustac. Railroad Co. v. Randall, supra, was to prejudical argument of counsel objected to by opposing counsel and persisted in despite orders from the court to desist. That decision in no wise supports the argument here made. In Kelly v. Strouse, supra, after having observed that it is the duty of counsel to protect his client, but it is much more the duty of the judge to save the law from being outraged, it is there said: "Neither the laches of the litigant nor the negligence of counsel will absolve the judge from his sworn obligation to administer the law." The ruling there made was a review of the action of the trial judge in entering *Page 480 
a judgment in favor of the plaintiff and refusing to allow the defendant to demur to the petition at the conclusion of the evidence. That was not a case where the non-action of the trial judge, in the absence of any request from counsel, was under review, and the decision has no application to the question here presented. There can be no serious challenge of the assertion of counsel to the effect that it is the duty of every trial judge to see that a fair trial is had according to law. We would be reluctant to believe that any trial judge is for a single minute throughout the trial unmindful of the solemn duty which rests upon him to see that the trial is conducted according to law, and that the law is protected against outrage. This does not mean, however, that it is either the duty or within the power of the Supreme Court to review the non-action of a trial judge where both sides are represented by counsel and where neither counsel requests the judge to act. A trial in Georgia is a trial according to law only when conducted according to the established rules of practice and procedure. One rule that has been asserted repeatedly, and applied in Aycock v. State, 188 Ga. 550
(10) (4 S.E.2d 221), is that an exception to evidence when offered upon the trial is essential to a review of the trial judge's action in admitting such evidence. There are no exceptions to this rule and none will be made in a given case as a substitute for action of counsel. The Code, § 81-1009, forbids improper arguments and imposes the duty upon the trial judge to interpose and prevent such arguments. Yet it has been held that, unless the court's attention is called to such improper argument and a ruling invoked upon the trial, it is too late to raise the point for the first time in a motion for new trial. In Young v.State, 65 Ga. 525, 528 (3), it was said that to allow one to keep silent during the trial and complain for the first time in a ground of a motion for new trial would be to let him lie in ambush both for the judge and the opposite party; and in Turner
v. State, 70 Ga. 765, it was held that, where the trial judge's attention was not called to improper argument during the trial, it would not constitute a good ground of a motion for new trial.
Thus it is seen that, to enforce by a review the performance of the duty imposed by statute upon the trial judge, the law in the form of a rule of procedure, requiring an objection during the trial, must be observed. The rules of practice and procedure are *Page 481 
just as much a vital part of the law of this State as any statute. They are so important that this court has repeatedly held that a constitutional question would not be decided by this court in the absence of compliance with the rules requiring that it be raised in the trial court. It is declared in the Constitution (Code, § 2-402), that "Legislative acts in violation of this Constitution, or the Constitution of the United States, are void, and the judiciary shall so declare them." Yet this court has held that, unless the attack specifies the statute and provisions of the Constitution violated and is made in the trial court, the Supreme Court will not rule upon the same. SavannahRailway Co. v. Hardin, 110 Ga. 433 (35 S.E. 681);Laffitte v. Burke, 113 Ga. 1000 (39 S.E. 433); Huiet v.Dayan, 194 Ga. 250 (21 S.E.2d 423); Black v. MilnerHotels Inc., 194 Ga. 828, 832 (5) (22 S.E.2d 780). The question now pressed by counsel was forcibly urged by counsel inAycock v. State, supra. There, as here, the attorney presenting the case to the Supreme Court was not the attorney who conducted the trial, and there, as here, a number of exceptions were made to evidence admitted without objection; and after careful study this court followed the established rule, citing at page 567 a number of decisions of this court which had applied it, and refused to rule upon the exceptions made. It was there said: "No court can proceed with order and do justice without the guidance and observance of rules of procedure which experience has taught are essential. . . We can not disregard one rule simply to enforce another. . . In the absence of proper objection at the trial, neither of these assignments of error can be reviewed by this court." We add to what was there said the further statement that such rules will not be violated by this court in order to decide questions in cases where counsel have ignored the established rules. We see here the total absence of any objection upon the trial to the matters complained of in the first four special grounds of the motion for new trial, and this court will make no ruling thereon.
2. Special grounds 6 and 7 except to a portion of the charge relating to a confession. The complaints are without merit and require no discussion here.
Special ground 8 excepts to a recharge upon request. The foreman of the jury stated that there were two ways in which they could put it if they found the defendant guilty, one, turn him *Page 482 
over to the court, and the other just find him guilty, requesting the court to explain the difference between them. Thereupon the court instructed the jury that, if they believed beyond a reasonable doubt that the defendant, at a time prior to the return off the indictment, in Bibb County, with the instrumentality named in the indictment, that is, poison, and with malice aforethought, either express or implied, did unlawfully and intentionally poison and kill the deceased in the manner charged in the indictment, then they would be authorized and it would be their duty to convict the defendant of the offense of murder, in which event the form of their verdict would be "We, the jury, find the defendant guilty," and that the verdict would mean that he would be sentenced to execution by electrocution, unless the jury saw fit to recommend him to the mercy of the court; and the court instructed them that the jury had the right to make such recommendation and attach it to their verdict in case they found the defendant guilty, with or without a reason, and that they could make it for any reason satisfactory to themselves or without any reason, and that they could make it arbitrarily, as a matter of course, or as a matter of discretion; and in the event they did so recommend the defendant to the mercy of the court, in case they found him guilty, then the form of their verdict would be "We, the jury, find the defendant guilty and recommend him to the mercy of the court," and this would mean that the defendant would be sentenced to imprisonment for life. The charge is criticized because it is contended that, in charging that it was possible for the jury to return such verdicts, it amounted to a statement by the court that a verdict of guilty was authorized under the evidence. It is contended that the charge is equivalent to saying that it is possible in this case for the jury to find a verdict of guilty without any recommendation; and it is contended that this necessarily conveyed the impression to the jury that such a verdict was authorized by the evidence, and that the court thought such a verdict was possible and proper under the evidence. The charge is a correct statement of the law and is not subject to any of the criticisms made.
The 9th special ground excepts to a portion of the charge wherein the court instructed the jury in substance that the defendant contended that he was not guilty, and that by his plea of *Page 483 
not guilty, his statement, and through his counsel he denied guilt, and he denies that the State had proved his guilt to a moral and reasonable certainty and beyond a reasonable doubt. The defendant contends that, whatever may have caused the death of the deceased, if it were in fact poison, he had no knowledge of it and had no connection with it, and is not guilty in any manner set out in the indictment. The excerpt then charges that, if from a consideration of the evidence, the defendant's statement, or from the defendant's statement alone, the jury had a reasonable doubt of the defendant's guilt, it would be their duty to acquit him. The attack upon the charge is that it is prejudicial and a misstatement of the defendant's contention, in that he has never admitted that his wife's death was caused by poison; that his plea challenged every material allegation of the indictment; and that he contended that in August prior to her death she fell and fractured her skull and never recovered from its effect, and this could have caused her death, and that the court ignored entirely the contention that the deceased had been injured. It is contended further that the confession was obtained through hope and fear and was not voluntary, and that the court failed to charge on the contention of the accused that the confession was not voluntary. The excerpt is further assailed because in the latter part thereof the court instructed the jury that, if they were not convinced of the guilt of the accused to a moral and reasonable certainty, it was their duty to acquit him; and it is contended that the court thus instructed the jury that they should convict if they believed his guilt had been shown to a moral and reasonable certainty, whereas the law requires that the guilt must be shown beyond a reasonable doubt. Without here quoting the different portions of the charge, it may be said that our examination of the charge reveals that the court repeatedly, as many as six times or more, instructed the jury that, before they would be authorized to convict, they must believe the defendant guilty beyond a reasonable doubt. Having thus elsewhere repeatedly instructed the jury on the question of reasonable doubt, and in fact in the short excerpt here under attack the court having instructed the jury that if there rested upon their minds a reasonable doubt of the defendant's guilt it would be their duty to acquit him, it was not error to follow this instruction with the language complained of, to wit, "or you are not convinced of his *Page 484 
guilt to a moral and reasonable certainty." Bone v. State,102 Ga. 387 (30 S.E. 845); Davis v. State, 114 Ga. 104
(39 S.E. 906); Robinson v. State, 128 Ga. 254, 258
(57 S.E. 315). All criticisms are without merit.
3. The general grounds and special ground 5 of the motion for new trial deny the sufficiency of the evidence to support the verdict. Many portions of the evidence are set forth in the statement of facts. The signed confession establishes every material element of the crime charged in the indictment. The testimony of the witnesses to this confession to the effect that it was freely and voluntarily made and was not induced by hope of reward or fear of punishment made a prima facie case and authorized the introduction of the confession in evidence. While the statement of the accused upon the trial denied the contents of the confession and contended that it was obtained by improper methods, this amounted to no more than an issue on the facts as to whether the confession was freely and voluntarily made, and this issue was one for the jury. Bryant v. State, 191 Ga. 686
(13 S.E.2d 820). There was no testimony of the State's witnesses showing illegal or improper methods employed for the purpose of obtaining the confession. While it is true that some officials had seen the defendant a number of times prior to the confession, and on each occasion he had told them that he was not ready to make a confession at such times but intended to make one later, yet the two persons who witnessed this confession had employed no improper methods for obtaining it, and the accused in his statement at the trial charged them with no improper treatment. The State's evidence, aside from the confession, strongly points to the guilt of the accused. His purchase and possession of the same kind of poison which caused his wife's death, his admitted and proved illicit relationship with another woman, his assurances to her that he would soon be in position to go with her, and his telephoning her within two or three hours of the death of his wife and stating that now he and his boys were hers if she wanted them, point strongly to the defendant's guilt.
Special ground 5 contends that the evidence does not show that the deceased was poisoned in Bibb County. This contention is predicated, of course, upon the assumption that the confession can not be considered. We think that the evidence, aside from *Page 485 
the confession, is sufficient to prove that the deceased was poisoned in Bibb County, Georgia, and died in that county as a result of the poison. The evidence shows her arriving home from work at between 5 and 6 p. m. and shows her in the constant presence of Mrs. Smith, who lived in the same house, from near 8 until 10 o'clock, and shows the arrival of her husband within minutes after Mrs. Smith left. The testimony as to the evident quantity of the poison taken and the time of its effect shows that she would necessarily have died within minutes after consuming that poison, and there is no question but that she was at her home, which was located in Bibb County, Georgia. The evidence authorized the verdict, and there is no merit in either of these grounds.
Judgment affirmed. All the Justices concur.