WOOLFOLK *vs.* THE STATE OF GEORGIA.

1. Where the testimony showed that, on the day after the killing, the
well on the place where it occurred was dragged, and a shirt and a
pair of drawers were found therein, having blood on them, and which
the State sought to show belonged to the defendant, and that about
ten days thereafter the well was cleaned out and a hat was drawn
up having blood on it, and which it was the theory of the defend-
ant belonged to one of the negroes on whom he sought to fix the
crime, and which the State did not claim belonged to defendant, it
was error to allow a witness to testify that when the hat was drawn

81   551
85    74
86   405

81   551
90   470

81   551
94   367

81   551
101  210

81   551
106  521

81   551
110  245
111  848

81   551
115  809

81   551
117  239

81   551
e120  156
e120  245
e120  246

81   551
d124   43
e124  340

81   551
129  251
d129  252

up it was claimed to belong to a certain small boy. If in fact it belonged to the boy, this should have been proved by proper testimony, and not by hearsay. Such a declaration had no connection with the homicide, and was not admissible as part of the *res gestæ.*

2. A statement, volunteered by a witness on cross-examination, that when the witness was informed of the killing of the family and the escape of only one, he said that one was Tom Woolfolk and he killed all the rest, was inadmissible.

3. Declarations made by one of the persons killed to her father, nearly a week before the killing, as to her fear that her life was in danger from the defendant, and that from the way he treated her she expected to be killed, were inadmissible.

(a) The fact that the defendant proved by a witness a statement of the same person tending to rebut the declarations referred to, and that counsel for the defendant were then notified by the court that, if he admitted this testimony, he would admit testimony for the State upon the same line contradicting it, but the defendant's counsel refused to make any agreement of this kind and insisted upon his legal rights to have the court rule the testimony offered by him in or out, whereupon the State's counsel withdrew his objection to the testimony for defendant, and it was allowed to remain in, did not justify the court in receiving the testimony as to the declaration first mentioned. The admission of illegal testimony on one side will not justify illegal rebutting testimony on the other.

4. A new trial is granted in this case with less reluctance because of the facts and circumstances relative to the conduct of certain persons in the crowd attending the trial, and the action and non-action thereupon by the court below.

5. It was not error to admit the testimony of a witness to the effect that, about two years before the killing, the defendant stated, after questioning the witness as to his knowledge of law, that he (defendant) had a father, step-mother and step-sisters (all of whom were killed at the same time, and for the killing of one of whom defendant was on trial,) and that defendant was going to have money before he died; and gave witness to understand that he was going to inherit that property.

6. Nor was it error to admit testimony in relation to the coroner's requiring the defendant, during the progress of the inquest, to remove his clothing, and the voluntary statements of the defendant made during the investigation. A coroner, sheriff or policeman, when he arrests a person charged with crime, has a right to search him for evidence of his guilt; and if, in the prosecution of such search, it becomes necessary to remove the clothing of the person arrested, the officer has the right to do so; and the testimony of the officer, or of those who were present at the time of the search, as to discoveries made during such search, is admissible.

7. It is not error for the judge to send the jury from the room until a witness has undergone preliminary examination as to threats made by a third person against one of the persons killed. Such a matter is in the discretion of the court in either a civil or a criminal case, and that discretion was not abused here.

8. Evidence as to a threat made by a third party against one of the persons killed, about two weeks before the killing, and unconnected with any act or circumstance of the killing, was properly excluded.

February 11, 1889.

Criminal law. Evidence. *Res gestæ.* Practice in superior court. Declarations. Conduct of trial. Jury and jurors. Before Judge GUSTIN. Bibb superior court. May term, 1888.

No report additional to that contained in the decision is necessary, except to state the ground for new trial referred to in the fifth division thereof, as follows:

(9) The court erred in admitting the following testimony of Dannenberg, and in afterwards refusing, on motion, to rule it out: "In 1885, he rented a store that was occupied by L. J. Lippincott & Co. I was the partner. He rented it and paid me the rent. He says, 'Dannenberg, you know a good deal about law, and you are a pretty smart man; tell me something in regard to property.' I says, 'I don't know nothing about law; I know about commercial law, but nothing about other law.' He spoke to me, and he says—I asked him some questions, and he told me he had a father and a stepmother and step-sisters, and he told me, 'I am going to have money before I die'; and he gave me to understand that he was going to inherit that property."—The objection was, that this conversation occurred in 1885, was too indefinite, and could not connect defendant with the killing unless by forced construction.

BACON & RUTHERFORD and F. R. WALKER, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general; W. H. FELTON, JR., solicitor-general, and HARDEMAN & NOTTINGHAM, for the State.

SIMMONS, Justice.

It appears from the record in this case that, on the night of the 6th of August, 1887, Richard F. Woolfolk his wife and six children, and Mrs. West were murdered. The defendant, Thomas G. Woolfolk, was indicted for the murder of his father, Richard F. Woolfolk, and was tried and convicted. He moved for a new trial on numerous grounds. His motion for a new trial was overruled by the court, and he excepted. As the case is to be remanded for a new trial, it is unnecessary for us to consider many of the grounds set out in the motion, such as the overruling of the motion for a continuance, newly discovered evidence, the disqualification of the juror Lumpkin, etc. We will confine ourselves in this opinion to the questions likely to arise when the case is again tried. The 7th, 8th and 12th grounds will be considered together. They are as follows :

(7) The court erred in permitting a witness to testify that when the hat was drawn from the well, it was claimed to belong to a son of Silas Woolfolk; the objection being that the testimony was hearsay and illegal, and that the witness did not state who it was who claimed that the hat was the boy's.

(8) The court erred in refusing, on the next day after it was given, to rule out the testimony of Davis, that after the killing some one stopped him and said, "Tell everybody that the Woolfolk family are all killed but one," and Davis said immediately, "The one that got away was Tom Woolfolk, and he is the one who killed all the rest." The motion to rule out was on the ground that this testimony was illegal, as what Davis said to

another was not proper testimony, it being only his conclusion.

(12) The court erred in permitting Howard to testify, in answer to the question, what Mrs. Woolfolk said to him when she was leaving, going home (and afterwards in refusing to rule out the testimony), as follows : "She said her visit was to see me and to know what to do ; her life was in danger from Tom Woolfolk ; the way he treated her, she expected to be killed."—The objection was, that the testimony was hearsay ; and that even dying declarations could not be given in evidence, unless it was first proved that the person was *in articulo mortis*, and was conscious of death at the time of making them.

. 1. The theory of the State was that the defendant did the killing ; the theory of the defendant was that it was done by other parties, certain negroes who were or had been employed on the plantation. The testimony showed that on the day after the killing, the well on the place was dragged, and a shirt and pair of drawers were found in the well. The shirt and drawers had blood on them. The State sought to show that they belonged to defendant. Some ten days thereafter the well was cleaned out, and while the cleaning was in progress, a wool hat was drawn up which, when examined with a microscope, was found to have blood on it. When this fact was being testified to by a witness, he was allowed by the court, over the objection of the defendant, to say that when the hat was drawn up, it was claimed to belong to a son of Silas Woolfolk, a small boy some ten years of age. The State did not claim that the hat belonged to the defendant ; and the theory of the defendant was that it belonged to one of the negroes upon whom he sought to fix the crime. In view of this, we think it was error in the court to allow this witness to

testify that when the hat was drawn up from the well, it was claimed to belong to this boy. This, if true, would entirely destroy the theory of the defendant as to the ownership of the hat; and if the hat in fact belonged to the boy, it should have been proved by proper testimony and not by hearsay. It was urged by the able counsel for the State that this declaration was properly admitted as a part of the *res gestæ*. We cannot agree with him in this view. We cannot see that the cleaning out of the well ten days after the homicide, and the declarations made when the hat was drawn therefrom, had any connection whatever with the homicide. If this declaration by an unknown party was admissible as a part of the *res gestæ*, we do not see why anything else that was said on that occasion about the homicide, or about the guilt or innocence of the defendant, would not have been likewise admissible. It would have been equally admissible to give in declarations of any of the parties cleaning the well that the hat was claimed to be the defendant's.

2. While the witness Davis was being cross-examined in regard to certain threats of the defendant, to which he had testified in his direct examination, he volunteered the statement complained of in the 8th ground of the motion, viz. that when he was informed of the killing of the Woolfolk family and the escape of one only, he said that that was Tom Woolfolk, and he killed all the rest. We think the court should have ruled this statement out, upon the motion of the defendant. It was clearly inadmissible. It amounted to nothing more than the opinion of the witness as to the defendant's guilt. It was just as inadmissible as it would have been if he had been asked his opinion as to whether the defendant was guilty or not. The counsel who argued this case for the State admitted before

us, in his argument, that it was inadmissible, but urged
that a new trial should not be granted on this ground,
because the record did not show that the motion to
rule out this testimony was made before the jury re-
tired to their room for consultation.   The motion for a
new trial states that the motion to rule out was made
the next day after the admission of the testimony.
While it is true that it does not allege in words that
the motion was made before the jury retired, we think
the record shows that it was made before that time.
Testimony covering over three hundred pages of the
record was taken after this motion to rule out was
made.   We therefore conclude that it was made in
time.

3. The next and most serious error complained of is
set out in the 12th ground of the motion.   It appears
that Mrs. Woolfolk visited her father on Sunday before
she was killed the following Friday night.   The court
allowed her father to testify to her statements and
declarations made to him on that Sunday.   This was
objected to by the defendant, and the objection was
overruled.   We think the objection should have been
sustained.   The declarations and statements which she
made to her father on that occasion were clearly in-
admissible.   If admissible, they constituted one of
the strongest circumstances against the defendant de-
veloped on the trial, and doubtless had a terrible ef-
fect on the minds of the jury.   It was urged in sup-
port of this ruling of the trial judge, that when the
defendant proved by Mrs. Edwards a statement of
Mrs. Woolfolk to the effect that the defendant had a
good heart, the State objected, and the court then
notified counsel for the defendant that if he admitted
this testimony of Mrs. Edwards, he would admit rebut-
ting testimony upon the same line.   But the judge says,

in his note to this ground, that counsel for the defendant refused to make any agreement of this sort, but insisted upon his legal right either to have the court rule in Mrs. Edwards' testimony or rule it out; and that the State's counsel withdrew his objection to the testimony of Mrs. Edwards, and it was allowed to remain in. We do not think that this state of facts would justify the court in receiving the testimony of Mr. Howard, the father of Mrs. Woolfolk, as complained of in this ground of the motion for a new trial. If the testimony of Mrs. Edwards was inadmissible, the court should have so ruled; and the State's counsel should not have withdrawn his objection on the supposition that he would in consequence be allowed to put in illegal testimony. We know of no law allowing offsets of this kind. The admission of illegal testimony on one side will not justify illegal rebutting testimony on the other. "Two wrongs do not make a right." Even if the doctrine of set-off could be applied to a case of this kind, the State in this case obtained a terrible advantage. The testimony of Mrs. Edwards was, that Mrs. Woolfolk said, in speaking of the defendant's marriage, "Whatever else may be said about him, he has a good heart." The reply to this, as put in by the State, came with crushing and overwhelming force: "She (Mrs. Woolfolk) said her visit was to see me and to know what to do; that her life was in danger from Tom Woolfolk—the way he treated her she expected to be killed." It is useless to discuss this further. The mere statement of it is sufficient to show its inadmissibility. On this subject see *Lyon vs. State*, 22 *Ga.* 399; Balt. & Susq. R. Co. *vs.* Woodruff, 4 Md. 243.

For the errors complained of in these three grounds, we are constrained to grant the defendant a new trial.

4. We grant a new trial in this case with less reluc-

tance, because of the facts alleged in the 19th and 20th grounds of the motion for a new trial. They are, in substance, that at the conclusion of the opening argument for the State, the crowd in the court-room applauded. The judge took no notice of this applause, except to rap with his gavel. And when counsel for the State was making the concluding argument, "from the crowd in the rear of the court-room came, in an excited and angry tone, the cry, 'Hang him! Hang him! Hang him!' and some of the crowd arose to their feet." The court rapped with his gavel and ordered the persons removed, but states that he does not know whether his order was carried into effect by the sheriff or not. Shortly after, another person sitting within the bar and near the judge cried out, "Hang him." The court ordered him removed, and he was carried down the back stairs. It is not known whether the jury knew that this person was taken out or not. All the jurors make affidavit that these things had no influence upon their minds; and from my own knowledge of the character of these gentlemen, I have no doubt that they believe this to be true. But can any man say with certainty that such things have no influence upon him? Can any of us know how far our minds are influenced by applause or excitement of a crowd which surrounds us? Can any of us say, even in this court, that this or that piece of testimony, or this or that argument of counsel, has not influenced our minds? Can any of us say that, on the trial of one of the most heinous crimes ever committed in this State or any other, the applause of the crowd, the fierce cries of "Hang him! Hang him!" from members of the crowd, followed later on by a repetition of the same cry from the lips of one of the most highly respected and esteemed citizens of the community, would have no influence upon our minds? Our minds

are so constituted that it is impossible to say what impression scenes of this kind would make upon us, unless we had determined beforehand that the prisoner was guilty or innocent. The question here is not what effect these things did have upon the minds of the jury, but what effect they were calculated to produce. We cannot determine what effect they did have, but it is apparent what effect they were calculated to have.

But counsel for the State argued before us that the defendant had no right to complain of these things. Whether this be so or not, we think the court below should have put the seal of its condemnation upon this conduct. We think the judge should have stopped the argument of the State's counsel then and there and ascertained the guilty parties, and should have punished them to the extent of the law. He should have taught them that the law was supreme; that the trial of a man for his life, however heinous the crime charged against him might be, was a serious and solemn thing, and that the law would not permit a mob to interfere, either by applause or by threatening and exciting cries. By so doing he would have upheld the supremacy of the law, and would have shown to the jury that whatever verdict they might find, the law would protect them. It would also have shown them that the court was uninfluenced by the feelings or demonstrations of the crowd; that it was still able to administer justice and to give the accused a fair and impartial trial. It would have given them a moral support, and would have tended to impress upon them the necessity of resisting such influences.

On this subject see Cartwright *vs.* State, 16 Tex. Court of App. 473, (49 Am. Rep, 826.) The defendant in that case was on trial for murder, and at the conclusion of the opening address of counsel for the prosecution,

the·audience applauded. The court did not reprimand the audience, or express disapprobation of the improper demonstration, nor was the jury cautioned against suffering this conduct of the audience to influence their minds in the consideration of the case. In his concluding argument, counsel for the prosecution referred to this demonstration in terms of approval, and still the jury were not admonished by the court to disregard this extraneous matter and to guard themselves against being influenced by it. In passing upon this, the Court of Appeals say, Willson, J., delivering the opinion : " It is unnecessary for us to determine whether or not we would suffer this conviction to stand if this exception presented the only ground of reversal. It is enough for us to say now that we think the court should have taken prompt and decisive action on the occasion, and should have endeavored by its condemnation of the proceeding, and its admonitions to the jury, to prevent any prejudice to the defendant by such reprehensible conduct. And in this effort on the part of the court counsel for the State should have united. As the matter is presented to us by the bill of exception, we cannot say that the defendant has had a fair and impartial trial upon the law and the evidence of the case." See also 44 Am. Rep. 29, and 48 Am. Rep. 334, and authorites cited.

We cannot say that this jury was influenced by any of these things, but will say that in all trials, either civil or criminal, the trial " is not to be affected or influenced by the clamor of the crowd, the pressure of public sentiment, or the thousand or more rumors that almost invariably attend every case of notoriety. There is no nobler spectacle than that of a judge and jury who quietly but firmly, in the face it may be of public sentiment and popular clamor, go forward and do their duty and their whole duty."

v 81–36

5. There are some other questions made in the motion for a new trial which it is necessary for us to notice briefly, as they will probably arise on the next trial. The first is as to the 9th ground of the motion, which relates to the admissibility of the testimony of Dannenburg. We see no error in admitting this evidence, on the ground urged in the motion for a new trial.

6. Nor was there any error in admitting the testimony of Davis, Brown and others, as complained of in the 13th and 14th grounds of the motion. This testimony was in relation to the coroner's requiring the defendant, during the progress of the inquest, to remove his clothing, and the statements of the defendant made during the investigation. The objection was, that the circumstances then surrounding the defendant amounted to force and compulsion. We see no error in the admission of this testimony. We think that the coroner, the sheriff or a policeman, when he arrests a person charged with crime, has a right to search that person for evidences of his guilt, and if, in the prosecution of this search, it becomes necessary to remove the clothing of such person, the officer has a right to do so; and when called upon to testify as to the discoveries made during the search, the testimony of the officer or those who were present at the time of the search would be admissible. If the Woolfolk family had been killed with any peculiar instrument, and when the defendant was searched that instrument was found upon his person, with blood and other evidences that it was the instrument used in the killing, would it be contended for a moment that testimony of that kind was inadmissible? So far as this record discloses, the statements made by the defendant were perfectly voluntary and not under oath. It is true that there was some excitement in the crowd during the day, and that the defendant

was under arrest charged with the murder of his whole family; but there had been no threats made against him, so far as the record discloses.

The rule laid down by Wharton in his Criminal Evidence, §§664, 668, upon this subject, is as follows : "A statement made voluntarily under oath by a witness before a coroner's inquest in answer to interrogatories there put to him, although he was at the time informed he was suspected of the crime, has been held subsequently admissible when he was on trial for homicide. But the testimony of an accused party, taken as such, is not admissible, when such accused party is put on his oath and sworn and examined."

Bishop, in his work on Criminal Procedure, vol. 1, §§1255, 1256, 1257, says : "The answers and other testimony which one voluntarily gives as a witness in any cause or proceeding, civil or criminal,—as before a . . . committing magistrate or a coroner, . . are, as admissions or confessions, competent against him on any issue in a criminal cause to which they are pertinent. So likewise is the party's own voluntary affidavit made on a motion for a continuance. But testimony involuntarily given, as for example, answers compelled from a witness who objects because they may criminate himself, or made under the pressure of an oath which the tribunal had no legal authority to administer, or uttered when, by reason of circumstances, he probably feels under a constraint to testify in a cause which in effect appears as his own, or otherwise under fear,—is not thus admissible. It is believed that the foregoing sections are correct in principle, and in accord with all but a few of the authorities. There are cases which seem to regard the oath as a disqualifying circumstance, without distinguishing whether it was lawfully required or not; and cases wherein the testimony is deemed inadmissible if given after the witness

is himself accused, when it would not be had it been
uttered before.   But while the latter distinction may
sometimes be of secondary consequence, it is believed
that what is said above covers, in reason and on the
better authorities, the whole ground."

See the authorities cited by these authors, which we
have examined, and which fully sustain the text.   See
also Dickerson *vs.* The State, 48 Wisc. 288, where this
subject is ably discussed; also Teachout *vs.* People, 41
N. Y. 7; and 3 Am & Eng. Encyc. of L. 470.

7.  The next ground complains that when the defend-
ant called Pennington as a witness, the court, on mo-
tion of the State's counsel, sent the jury from the room
until the witness had undergone a preliminary exami-
nation as to certain threats made by one John Jeff.
There was no error in this action of the judge in send-
ing the jury out so that they could not hear this testi-
mony.   We think that it is within the discretion of the
court, either in a civil or a criminal case, whether the
jury shall be sent out so that they may not hear certain
preliminary testimony, or whether they shall remain in
the court-room and hear it.   And we will not control
that discretion unless its exercise is abused, and it was
not abused in this case.   The State's counsel, in the ar-
gument of this question, relied on the case of *Hall vs.
The State*, 65 *Ga.* 36, and contended that whenever con-
fessions are about to be given in, it is the imperative
duty of the judge to send the jury out.   We have ex-
amined the record of that case in the clerk's office of
this court, and find that that question was not made in
the record.   There was no complaint, hint or intima-
tion, either in the motion for a new trial or in the bill
of exceptions in that case, that the judge trying the
case failed or refused to send the jury out; and what
was said, therefore, by the court in laying down that

rule, was *obiter*. Besides, the court in that case failed to notice the decision in *Holsenbake vs. The State*, 45 *Ga.* 43, where the question was directly made, and was ruled to the contrary of the view announced in *Hall's* case. We think the better practice is to leave it in the discretion of the court, and not to bind the court by any unbending rule in this respect.

8. The next ground we shall notice relates to the exclusion of Pennington's testimony as to a threat made to him by John Jeff. The defendant proposed to prove by Pennington that, some two weeks before the killing of the Woolfolk family, he was in Macon, and employed Jeff to assist him in carrying a lunatic to the depot, and that he and Jeff had some controversy as to what he should pay Jeff; and Jeff said to him, "You have treated me like the damned Woolfolks. I have been chopping cotton for them, and I intend to kill the last damned one of them." The court excluded this testimony, and stated that he would not allow it in, but that if anything more than already appeared in the evidence should be brought out pointing to Jeff, he would admit it. The defendant then showed that Jeff had worked for Richard F. Woolfolk, the deceased, during 1887, and up to a short time before the homicide; had chopped cotton for him and had not worked that year for any other Woolfolk, and had quit him about two weeks before the killing. After the introduction of this testimony, he again offered Pennington as a witness to prove the threat above referred to, and the court excluded the testimony.

There was no error in the ruling of the court excluding his testimony. We do not think that a single isolated threat of a third party, unconnected with any other act or circumstance of the killing, is admissible. "While evidence tending to show that another party

might have committed the crime would be admissible, before such testimony could be received there must be such proof of connection with it, such a train of facts and circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts disconnected, and outside the crime itself, cannot be separately proved for such a purpose. In considering the question, we have carefully examined the numerous authorities cited to sustain the position that the evidence was competent, and none of them hold that under such circumstances it could lawfully be received." Greenfield *vs.* People, 85 N. Y. 75.

In the case of The State *vs.* Beaudet, 53 Conn. 536, Loomis, J., in an able and learned opinion, reviews all the authorities upon this question, and announces the decision of the court in the following head-note: "Upon a trial for an assault on A with intent to murder, in which the defence was that B and not the prisoner made the assault, evidence of threats of B against A was held inadmissible." This was a case of circumstantial evidence against the accused. See also 4 Am. and Eng. Encyc. of Law, p. 866, where the subject of threats of third persons is treated. The author says, upon this subject, "It is therefore going far enough in favor of the accused, to allow him to exculpate himself by showing the fact of another's guilt, by some appropriate evidence directly connecting that person with the *corpus delicti*. The animus of a third person is no defence, and by itself it cannot prove the ultimate fact which is a defence." Numerous authorities upon this subject will be found collated in this book.

The fact that Jeff chopped cotton with the deceased and left him two weeks before the killing, was not sufficient to connect the threats with the killing. There was no ill feeling shown between him and Woolfolk;

there was but this single threat; no quarrel was shown between them, or any. other fact to connect Jeff with the killing. We therefore hold that the court was right in excluding this threat from the jury.

These are the only grounds of the motion for a new trial which, in our opinion, it is necessary for us to notice.

Judgment reversed.