1. The judge did not err in overruling the motion for a continuance, based on the ground that counsel appointed by the court to represent the accused had not had sufficient time to prepare for the trial. Nor does it appear that the defendant was denied the right to be defended by employed counsel of his own choice or selection.
2. Where a witness testifying on the trial of the accused for murder referred to a different offense (larceny), and stated that the accused admitted it, and, on objection being made to such evidence on the ground that it put the defendant's character in issue, the judge stated: "I rule that out. Just disregard that statement, gentlemen of the jury" — Held, that there was no error in overruling a motion for a mistrial based on the same ground as the objection.
3. The judge did not abuse his discretion in allowing the jury to remain in the courtroom and hear preliminary evidence as to whether a claimed confession of the accused was freely and voluntarily made; such preliminary evidence being sufficient prima facie to authorize consideration of the confession.
4. The charge defining an accomplice, and stating among other things that the jury would not be authorized to convict the defendant on the uncorroborated testimony of an accomplice, was not erroneous for any reason assigned. *Page 174 
(a) The evidence authorized the verdict, and the court did not err in refusing a new trial.
 No. 15478. JULY 5, 1946. REHEARING DENIED JULY 16, 1946.
Robert Lee Stanford was convicted of murder, without a recommendation, in the alleged killing of Wo Gee Chow, alias Harry Woo, by shooting him with a pistol. His motion for a new trial as amended was overruled, and he excepted.
The deceased operated a mercantile store in the City of Augusta, and was killed in his store some time during the night of October 6, 1945. He had closed his store for the night and was shot from the outside of the building, through a hole in a window called a "cat-hole." The slayer then entered the store and stole a pistol and several hundred dollars in money. The indictment alleged that the offense was committed on October 15, but the evidence showed that it was committed on Saturday night, October 6.
The following is deemed a sufficient statement of the evidence, although it does not include the testimony of all the witnesses who were introduced. Matthew Jones testified: "I was picked up and arrested and questioned about some shells, along with Robert Lee Stanford, by Mr. King and another sheriff. I knew Robert Lee Stanford, and we delivered milk on Saturday afternoon for Mr. Moses, where we worked. We delivered milk to Woo, the Chinaman. When Mr. King picked us up and asked me about the shells, he also asked me where we were Saturday night. I told him we got off the truck and went around some corners until we came to 12th Street, where we went in a pool room and whisky joint. I just stood in this place and Stanford was drinking beer, whisky, or something in a tumbler, and then we started to shoot pool and a boy asked me how old I was, and I told him 16, and he told me I was too young to be in there so I went outside. The pool room is about three blocks, I think, from Woo's place, and Stanford stayed in the pool room about five minutes before he came on out and met me. Stanford told me he was broke and wanted some money, and he said he was going to get some from Woo's store. When we got off the truck, I gave Stanford my gun. The gun you have there is the one I gave him that night when we got off the truck. . . I asked Stanford how he was going to get some money. Stanford *Page 175 
said he was going to rob this Chinaman, but I told him not to kill the Chinaman, but he didn't answer and just walked off. I stood there for a while, then went up to a store about a block down and bought some sugar cane, which I gave to a little boy. Two more boys came along and I thought I knew these boys and talked to them for about fifteen minutes, then I went down the street, and came back up the street, and went to turn by the hairdresser's on 12th street, at which time I heard the gun fire. I did not know whether Stanford had killed the Chinaman or the Chinaman had killed him. I started to go home then, when I heard Robert Lee whistle for me, while he was coming down the other side of the street. I waited for him and he said, `Let's go home,' and also, `I had to kill Harry.' I didn't say anything but went on with Robert Lee Stanford to the house that we stay in at the dairy. When we got inside, Robert took out a lot of money and we divided it by making two piles of fives and tens. Robert took one pile and I took the other pile of money. Robert left the pistol I gave him around in my room. Robert had the gun marked `Exhibit A' with him, which he said he got out of the Chinaman's store. My brother hid the money I got for me, in the light of an automobile, where the officers found it. Stanford said he got the money from Harry Woo, whom he shot and killed. That .38 pistol is the gun I let Stanford use. All this happened on a Saturday night in October of this year in Richmond County, Georgia."
Cross-examination: "I am in jail, but I do not know whether or not I am charged with this same killing. They told me I was with him and charged with the killing. . . The sheriff's men have not talked to me, nor have anybody else except the three defense counsel. Three or four men came around to see me, but I just remember him. (Pointing to Mr. Flythe.) I think I remember him. (Pointing to Mr. Kerr.) I don't remember talking to you. (Addressing Mr. Ingram.) I remember talking to that gentleman yesterday afternoon and remember what I told him. (Pointing to Mr. Kerr.) The only thing I told him was that they had me with Stanford for murder charge."
R. W. King, deputy sheriff, testified in part as follows: "I investigated the killing of Harry Woo . . this month, 1945. On October 12th I investigated a call to Harry White's place, who had lost thirteen boxes of gun shells. When I got to this place I looked *Page 176 
where the shells had been and saw a milk box that was cut off from view from the front. . . I went in and questioned Robert Lee Stanford because he was working on a milk truck at White's place, and he was putting it in that box and the shells were over there in hand reach of the counter, and I questioned him and took him out and put him in jail. I put him in jail on the shotgun business and also put in another boy with him, and we cleaned up the shell business. He admitted it. . . I had a warrant in that case. We finished the shell case, then we were called on another investigation, where he had been working on this milk truck, he was furnishing milk to the Chinaman, for over two years. Then I called in the city men and we started talking to him about that, I mean we started talking to Robert Lee Stanford and Matthew Jones. . . After Jones told me about this affair with Woo, I put him in jail. In the presence of Stanford he told us that they went to Terry Robinson's place, after getting off the milk truck on 9th Street, and shot pool a while. Matthew Jones said they ran him out because of his age, and that he went outside and watched the Chinaman's store, and when it closed up he went out and called Robert Lee Stanford and said, `Come on let's go.' Jones said further there that, when Stanford came out, he walked around into the yard and then came back and asked him, Jones, for the pistol. Stanford said, `Give me the pistol, it is time right now.' He said he gave him the pistol and told him, `Don't kill him.' Stanford replied, `I won't kill him but I will fix him so he can't do anything.' Jones walked on up the street watching, and heard the pistol fire, after which Robert Lee Stanford came out and met him at 12th Street and walked on up to the bus station and attempted to get on the bus, and that they were drinking and the bus driver wouldn't let them go on so they walked on out home. . . All this was said in the presence of Stanford. Then, we carried Stanford out and he said, `Well, I just as well tell the truth, I done it.' . . Before this statement was made by Stanford, we did not place him under the slightest fear of punishment or the slightest hope of reward. It was purely voluntary on his part at that time. Mr. Kent warned him several times of his rights, and it was made without the slightest hope of benefit or the slightest fear of injury. Mr. Kent told him that anything he said would be used against him, and that we were not offering him a thing in the world, and *Page 177 
that we were not telling him that the court was going to fine him, and further that we did not know what the court would do. . . Then Stanford said that he was speaking only the truth. Then Stanford told us that he had the boy watching for him. He said that they shot pool, and the boy called him out of the place, and they walked in that yard and could see the Chinaman back there in the back; that he came back and got the pistol, and was told by this boy not to kill him, to which he replied, `I won't but I will fix him so he can't do nothing.' He said he went on around there with his gun, and he showed me exactly how he had his finger on the handle, and he said he crawled up on a crate and turned the light out. He said he unscrewed the light which shined over in the back yard, and that the Chinaman did not notice that, and that he went on around to the cat-hole. There is a little cat-hole on the left-hand corner of the window facing the back, just about six inches square, or hardly that big. Stanford said he was making his way on to the cat-hole, and that his foot hit a crate and turned it over, and that some bottles made a noise, and that he saw the Chinaman heard him and that he kind of turned like and knew he had to shoot quick, so he just dropped the gun and shot him. He said he thought he got a good shot. He said he took a screw driver and went in the store, by making three holes in the heavy mesh wire. He made a hole big enough for his hand to go in, and unlatched the door and went in and got the money and the Chinaman's gun and came on out and met Matthew. He said they went on to the bus station, but the bus driver wouldn't take them, and that they went on home, divided the money, went to bed, and worked the next morning until eight o'clock. He told me that he kind of turned Woo over and went in his pockets, got his pocketbook and burned it at his house. He said the money was all on the table at Woo's, that Woo had some in his hand, and that there was a little metal box there, which he presumed that Woo was going to put the money in. . . The $306 you have in that envelope was recovered from Johnny Jones, who is a twin brother of Matthew Jones. . . The $306 marked `Exhibit E' is the Matthew Jones' share of the loot, and when Matthew told us that he had given it to his brother, we contacted his brother and he showed us the money. . . Mr. Fulghum was my partner in the investigation, and everything I have said happened in Richmond County, *Page 178 
Georgia, except what I said happened in Warren County, starting on October 12, 1945, and went on through October 14, 1945."
Cross-examination: "I arrested Robert Lee Stanford on October 12th, and his statement was made on Sunday, October 14. Mr. Kent, Mr. Fulghum, Mr. J. O. Smith, and Mr. Roscoe Holley were present when this statement was made. Mr. Fulghum, my partner, wrote it down. It was made in the county jail in one of the little rooms back there which has a desk in it. That is where they made a sketch of the statement, but the actual typewriting later. . . I don't know what floor he was incarcerated at the jail. I talked to him twice about the shotgun shells, but just one time to him on the statement before he made it. I don't know whether he was in a solitary cell at the jail or not. We brought in Matthew Jones to face him. . . We took Stanford to the scene of the crime, where he showed us exactly how he did it, and showed us the crate he knocked, and the hole and how he held the pistol and everything."
J. G. Fulghum, another deputy sheriff, testified: "I was with officer King in the investigation of the killing of Harry Woo, the Chinaman. I was present in the jail when Robert Lee Stanford made a statement about his connection with the killing. He was not placed under the remotest or slightest fear of punishment nor the slightest hope of reward given to him. The statement he made was absolutely and purely voluntary on his part. He was advised of his legal rights by Mr. Kent at the time. Stanford told us everything from the time he got off the truck on. He told his part all the way round, from 9th and Wrightsboro Road to Terr's Place on 12th, and from there to the Chinese store, and he went over the act of killing, went through the whole thing, and told us exactly how he did it and all about it. He didn't tell us the amount he got out of it but he did tell us he got the money and picked it off the table and went in the man's right-hand pocket and got his billfold out of it and left the pocket turned out. He said he got a gun at Woo's store."
John F. Battle testified: "I am city editor of the Augusta Chronicle, and I went to Harry Woo's place when the body was found and saw the body. . . I think it was the 14th, I went to the county jail and saw Robert Lee Stanford in the office of the finger-print department and asked him one question. I asked him. `Did you kill this Chinaman?' and he said, `I did.' . . I did *Page 179 
not put him under any fear of punishment or offer him anything. It was his free and voluntary answer to my question."
The State also introduced in evidence an affidavit signed by Robert Lee Stanford by mark, dated October 14, 1945, containing substantially the same statement as that testified to by officer King, as to the details and circumstances of the killing.
No evidence was introduced on behalf of the defendant, but he made the following statement to the jury: "Well, I was drinking that wine and whisky all mixed up together. Then me and Harry, we have gambled together, and we were good friends, and I delivered milk there two years and six months or a little better and I wouldn't have hurt him for anything in the world but I was drinking that mixture. I wasn't aiming to kill him; I just stumbled into that crate there; I wasn't aiming to do it, and I ask you all to believe me because me and him had been and been knowing him a good while and I delivered milk there and we were good friends, and I wouldn't have killed him but I was drinking and drunk, and the bus driver wouldn't even let me ride on the bus, and this boy had to tote me along to keep me out of the road, and I ask you all to be merciful to me. That is all I have to say."
The original motion for a new trial contained the usual grounds, that the verdict was contrary to the evidence and without evidence to support it.
The amendment to the motion for a new trial contained four special grounds, numbered therein as 4, 5, 6, and 7. The trial judge unqualifiedly approved grounds 5, 6, and 7. The first special ground, numbered 4, was not approved as presented, but the judge stated at length and specifically the parts that he did approve. It appears both from the allegations in this ground of the motion and in the judge's statement, that, on the call of the case for trial on October 25, 1945, a motion for a continuance was made. This motion was in writing, and was signed by Eugene M. Kerr, Albert G. Ingram, and Starkey S. Flythe, who had previously been appointed to defend the accused; Messrs. Ingram and Kerr having been appointed on October 17 and Mr. Flythe on October 18. The motion was verified by an attached affidavit signed by Mr. Kerr. It also appears that two of the attorneys so appointed made oral statements to the court in support of the motion, and that the solicitor-general, Mr. Hains, and his assistant, Mr. Kennedy, made statements in opposition. *Page 180 
The written motion for a continuance alleged: (1) The principles of justice require a continuance. (2) Counsel for the defendant were notified of their appointment only seven days from the trial date. (3) Counsel for the defendant have not had ample opportunity to prepare a defense for the defendant. (4) Eugene M. Kerr, one of the defendant's counsel, was sick and confined to bed from Saturday night, October 20, until Tuesday morning, October 23; and said counsel was also representing Ruth Twiggs in a murder case on Wednesday, October 24, and could not devote any time to the preparation of the defense in the case above stated until after the disposition of said Twiggs case. (5) The defendant has stated to his counsel that his defense is an alibi, and time is needed to investigate the same and to subpoena witnesses, who may have seen him at some other place at the time of the crime.
The attorneys were notified of their appointments by letters written to them by the solicitor-general on October 17 and 18, as above indicated, stating that they were appointed to defend Robert Lee Stanford, Matthew Jones, and Johnnie Jones, charged with murder, robbery, and receiving stolen goods; also that "this case will be tried on Thursday, October 25, 1945."
Mr. Kerr, for the defendant, after reading and presenting the written motion for a continuance, stated: "I understand in addition, your Honor, the defendant has an alibi for the defense. We just can't prepare a defense over night; you just can't pull one out of thin air. This boy is on trial for his life. As far as we are concerned, we are receiving no compensation for this and the quicker we dispose of the matter the better for us, but, on the other hand, if we are going to represent this boy. . . As for myself I wouldn't feel that I am giving this boy proper representation, even thought I am not retained by him. I feel that the State is going to give the best the State of Georgia has on it, and I believe it will be lacking in nothing, but I am afraid mine will be lacking in the matter if the court requires me to go to bat right now with the State. So, I respectfully move the court to give us a continuance for one term of court so the ends of justice will be met here."
Mr. Flythe stated: "I concur with Mr. Kerr in this motion, under the facts given, to give this defendant the best defense possible, in view of the fact that Mr. Kerr has taken two days in other cases, and defense counsel have not had time for consultation and a proper preparation to give this boy the best defense possible." *Page 181 
The Court: "When were you appointed?"
Mr. Flythe: "Last Thursday, a week ago today."
The solicitor-general stated: "We are opposing this motion, your Honor, on the ground that immediately when this defendant was indicated we went to the jail to consult this defendant to offer and give him every right he was entitled to, and to ascertain whether he had a lawyer or not, and apparently he wasn't going to get a lawyer, and we then immediately requested the court not to give him one lawyer but give him three in order that he would get every opportunity for the preparation of his defense. That was a week ago. The lawyers in this case, so far as we know, or some of them, immediately went to work on this case. Last Sunday Mr. Kerr went to Athens and took sick. Those things happen. There were two other lawyers in this case. Mr. Kerr, today, is well; he was in court yesterday in another murder case and well enough for that purpose. We appointed him and Mr. Ingram and Mr. Flythe and they have had ample opportunity to work up any alibi they might have. We will state further that they have been working on this case. They have even gone into the question of mind in this matter, and the court has co-operated with them fully, and even sent to the hospital, and they have been working on this case and have had every opportunity to do it. If it hadn't been for that, there never would have been any insistence for a trial in this case. There is no reason for us, and we are not disposed to rush or railroad the thing, but we know and they know they have had opportunity of getting that from the court if there is anything genuine about it. If there is an alibi, there is no necessity of going out of the State to get up witnesses. They could have gotten them in a day. We respectfully submit that this motion should be overruled."
Mr. Kennedy, the assistant solicitor-general, stated: "I concur with the solicitor-general. There has been no showing made here that anything is lacking. They say he contends that he has an alibi, but there has been no showing by Mr. Ingram and Mr. Flythe that they have now exhausted all possible means of his defense. A week is ample time to make preparation, as the solicitor has pointed out. This matter is purely local. The defendant lives here, and the crime, of course, was committed here, and there is no other territory to be covered and certainly in a week's time any possible efforts could have been exhausted by three gentlemen." *Page 182 
The following additional statement was made by Mr. Flythe: "This defendant was only indicted October 17, 1945. That was eight days ago. The ends of justice certainly can not be hurt in any way by granting this continuance. The State says they have given this man three lawyers, but one lawyer has been sick for two days, and he having another case in court, it was absolutely impossible for us to give this defendant our best. We did everything we could because we did not know what disposition the court would make of this motion, and that is why we did what we could, but we are hoping and still hope the court will grant this motion because no harm will be done the State and no harm will be done to justice."
The judge overruled the motion for a continuance, which as shown above was based on the ground that the attorneys had not had sufficient time after their appointment to prepare for the trial.
In the first special ground of the motion for a new trial (numbered 4 in the amendment) the defendant complained of the overruling of his motion for a continuance, as stated; and in the same ground he contended that, "When the court so denied him a continuance . . he was in fact denied his constitutional rights to be defended by counsel of his own selection." While in connection with both contentions he made certain allegations which, if true, would have introduced some facts additional to those that have already been stated, the foregoing is a statement of all of the material facts touching either contention, so far as this ground of the motion for a new trial was approved or verified by the trial judge. It appears from the record that the attorneys that were appointed did represent the accused on the trial, and thereafter prepared the original and amended motion for a new trial. After this motion was overruled, and a new trial denied, the defendant requested present counsel to act as his attorney in presenting his bill of exceptions and carrying the case to the Supreme Court.
The statement made to the court by the solicitor-general in opposing the motion for a continuance, that "apparently he [the defendant] wasn't going to get a lawyer," is nowhere controverted, but the defendant averred in his motion for a new trial that, while he was in jail, he was asked by the solicitor-general if he had employed counsel to represent him, to which he replied in the negative. *Page 183 
In the second special ground of the motion for a new trial (numbered 5 in the amendment), error was assigned on the failure of the judge to declare a mistrial. R. W. King, a witness for the State, testified: "I went in and questioned Robert Lee Stanford because he was working on a milk truck at White's Place, and he was putting it [milk] in that box and the shells were over there in hand reach of the counter, and I had questioned him and put him in jail. I had him put in jail on the shotgun-shells business and also put in another boy with him and we cleaned up the shell business. He admitted to it." As stated in this ground of the motion, "When this testimony was introduced . . it was objected to as follows, by Mr. Flythe, for the defendant: `I move to rule that out and move for a mistrial on the ground that it brings this defendant's character in evidence when it hasn't been in;' to which objection the court ruled as follows: `I rule that out. Just disregard that statement, gentlemen of the jury.'" It was assigned as error that the quoted testimony tended to put the defendant's character in issue, when he had not tried to prove good character, by charging him with an offense other than that for which he was being tried; that there was no charge or evidence that the deceased was killed by the shotgun shells referred to; and that the impression made upon the minds of the jury could not be eradicated by an instruction for them to disregard it.
The third special ground (numbered 6 in the amendment), was as follows: "Because the court erred by allowing the jury to be present and to hear the foundation laid by the State for the introduction in evidence of a confession of the defendant, as against the following motion that was made by counsel representing the defendant, to wit:
"`Before the solicitor goes into this, we respectfully ask the court to ask the jury out to lay the basis for this confession, if it was freely and voluntarily made.'
"Court: `Gentlemen of the jury, go right out there, please, and we will call you back in a minute.' Jury retires.
"Mr. Flythe (for the defendant): `We ask the State before this alleged confession is introduced in evidence, lay the basis and prove that this confession was voluntarily made without any threats being made and without any promises. We respectfully submit that, be before the confession is submitted in evidence, . . the State prove that it was made without hope of benefit or fear of injury.' *Page 184 
"Court: `Well, the section of the Code is this: "To make a confession admissible it must have been made voluntarily without being induced by another by the slightest hope of benefit or the remotest fear of injury." All right, bring the jury in.' Jury returns.
"Although there was no evidence offered in conformity with the requirement of the Code to lay the foundation for the introduction in evidence of the confession claimed as offered in evidence."
The fourth special ground (numbered 7 in the amendment) assigned error on the following excerpt from the judge's charge: "I charge you, if you believe Matthew Jones, a witness introduced by the State, was an accomplice of the defendant in this charge of alleged murder of the deceased Chinaman, as the State contends that he was, and you are to say from the evidence along with the prisoner's statement whether or not he was an accomplice of the defendant in this alleged crime of murder, you would not be authorized to convict the defendant on the uncorroborated testimony of an accomplice. An accomplice is a partner and associate of the defendant in the alleged crime of murder. If you do not believe from the evidence along with the defendant's statement that he was an accomplice, this rule of law given you as to an accomplice does not apply." The errors assigned were: (a) said charge was ambiguous and confusing to the jury; (b) the evidence showed that Matthew Jones was a primary principal, and not an accomplice; (c) the court did not state whether Matthew Jones had to be an accomplice before or after the fact; (d) the charge as given was erroneous, as there was nothing in the prisoner's statement that justified the court in referring to his said statement, or even intimating that Matthew Jones was an accomplice, either before or after the fact as to the crime in question.
1. The allegations of fact in the first special ground of the motion for a new trial were approved only in part by the trial judge. In the view we take of the case, we may treat this ground as being valid to the extent that it was approved, without deciding whether it was destroyed in its entirety by the *Page 185 
judge's order. See Jordan v. State, 153 Ga. 167
(111 S.E. 417); Hatcher v. State, 176 Ga. 454 (4) (168 S.E. 278).
The facts set forth in that ground, so far as they were approved or verified by the trial judge, do not show an abuse of discretion in refusing to continue the case in order to allow attorneys appointed to represent the accused additional time to prepare for the trial. Three attorneys were appointed, two on October 17 and one on October 18; and the case was called for trial on October 25. While it appears that one of these attorneys was sick for two or three days during this period, and also that he had to defend another murder case on October 24, the judge did not abuse his discretion in overruling the motion for a continuance, so far as the mere question of time is concerned.Charlon v. State, 106 Ga. 400 (2) (32 S.E. 347); Kelloy
v. State, 151 Ga. 551 (107 S.E. 488); Ivey v. State,154 Ga. 63 (1-2) (113 S.E. 175); Cannady v. State, 190 Ga. 227
(9 S.E.2d 241); Smith v. State, 198 Ga. 849 (2) (33 S.E.2d 338).
But it is contended in the same ground of the motion for a new trial that, when the judge overruled such motion for a continuance, he thereby denied the defendant his right to be defended by employed counsel of his own choice or selection. No one could properly say that the defendant did not have the right under both the State and Federal Constitutions, but it does not appear that he was prevented in any manner from exercising it, had he desired to do so. Compare Andrews v. State, 196 Ga. 84
(1), 94 (26 S.E.2d 263). Manifestly, he was not deprived of it merely because the judge was informed by the solicitor-general that "apparently he wasn't going to get a lawyer," and the judge then appointed attorneys to represent him. Nor are there any other facts to show interference therewith. If the defendant had desired to employ other counsel, or had wished additional time to see if he might arrange to do so, he could have so informed the court, and if he had done this, a very different situation would have been presented. However, he proceeded with the trial, impliedly accepting the services of the attorneys that were appointed for him, and later, in his motion for a new trial, gave the first hint that he desired other counsel. As indicated above, the legal contentions made in this ground of the motion depend on the facts set forth in the judge's statement, and these facts do not support the contention as to denial *Page 186 
of the right to employ counsel. The mere existence of the right would not affect the validity of the defendant's conviction, for there must be a denial of it or the equivalent of such denial before he can complain. Clarke v. Cobb, 195 Ga. 633 (2) (24 S.E.2d 782); Fowler v. Grimes, 198 Ga. 84
(31 S.E.2d 174).
The case differs on its facts from Walker v. State,194 Ga. 727 (2) (22 S.E.2d 462), where the accused made known to the court, at the time the case was called for trial, that he wanted his people to get him a lawyer.
The solicitor-general, in opposing the motion for a continuance, used the expression, "We appointed." Considering the entire record, it can not be assumed from this statement that the solicitor-general instead of the judge exercised such prerogative.
2. The second special ground complains that the court erred in refusing to declare a mistrial because a deputy sheriff, while testifying, referred to a theft of shotgun shells and stated "he admitted it." As soon as this testimony was given, counsel for the defendant objected to it and moved to rule it out, and also moved for a mistrial, on the ground that it put the defendant's character in issue. Thereupon the judge stated: "I rule that out. Just disregard that statement, gentlemen of the jury." The fact that the judge did not also declare a mistrial is not cause for a reversal. Withrow v. State, 136 Ga. 337 (3) (71 S.E. 139);Wells v. State, 194 Ga. 70 (4) (20 S.E.2d 580); Tye v.State, 198 Ga. 262 (4) (31 S.E.2d 471); Eden v. State,43 Ga. App. 414 (159 S.E. 134); Harrison v. State,601 Ga. App. 610 (3) (4 S.E.2d 602).
3. In his third special ground, the movant complains because the court allowed the jury to remain in the courtroom and hear preliminary evidence as to whether a confession was freely and voluntarily made. The judge at first acceded to a request to have the jury excused from the courtroom pending the introduction of such evidence, but on being further informed as to the purpose of the request, he recalled the jury and allowed them to hear the evidence. The judge had a discretion as to whether he would allow such preliminary examination to be conducted in their presence, and the evidence being sufficient to show that the confession was freely and voluntarily made, the course which the judge adopted affords the defendant no cause for complaint. Holsenbake v.State, 45 Ga. 43 (2) ; Woolfolk v. State, 81 Ga. 551
(7) (8 S.E. 724); *Page 187 Fletcher v. State, 90 Ga. 468 (17 S.E. 100); Weaver v.Carter, 101 Ga. 206, 210 (28 S.E. 869); Griner v. State,121 Ga. 614 (3) (49 S.E. 700); Adams v. State, 129 Ga. 248,251 (58 S.E. 822, 17 L.R.A. (N.S.) 468, 12 Ann. Cas. 158); Morris v. State, 200 Ga. 471 (37 S.E.2d 345).
4. In the fourth special ground, the movant complained of an excerpt from the charge of the court defining an accomplice and stating that, if the jury believed Matthew Jones was an accomplice of the defendant, they would not be authorized to convict the defendant on the uncorroborated testimony of an accomplice; but that, if they did not believe from the evidence along with the prisoner's statement that the person named was an accomplice, this rule of law would not apply. The entire excerpt complained of has been set forth in the statement of facts together with the assignments of error made thereon. The charge was not erroneous for any reason urged.
The evidence authorized the verdict, and it was not error to refuse a new trial.
Judgment affirmed. All the Justices concur. *Page 188 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 189